**COMMONWEALTH of Pennsylvania,
Appellee,**

v.

**Benjamin R. REPPERT, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 5, 2002.
Filed Dec. 10, 2002.

Timothy A. Finn, Beaver, for appellant.

Ahmed Aziz, Assistant District Attorney, Beaver, for Com., appellee.

Before: McEWEN, P.J.E., JOHNSON, HUDOCK, FORD ELLIOTT, ORIE MELVIN, TODD, KLEIN, BOWES, and GRACI, JJ.

JOHNSON, J.

¶ 1 In this case we determine whether a police officer's observation of head and shoulder movements of the rear seat passenger in a motor vehicle, coupled with the officer's conclusion during a routine traffic stop that the passenger appeared "very, very nervous," provides sufficient reason for the officer to detain and search that passenger. Following a suppression hearing, the trial court concluded that the officer's observations were indeed sufficient. Defendant Benjamin R. Reppert appeals the court's ruling, contending that the officer's observations failed to create a reasonable suspicion of his involvement in criminal activity. We agree with Reppert's assertion and conclude accordingly that the officer detained him illegally. Accordingly, we reverse Reppert's judgment of sentence.

¶ 2 The record of the suppression hearing conducted by the trial court reveals the following uncontested evidence. On April 6, 2000, Reppert was riding as a passenger in the back seat of a car owned and operated by his friend, Justin Morgan. Morgan's car, a 1987 Dodge, displayed expired inspection and registration stickers. Driving down Fifth Street in the Borough of Beaver, Morgan passed Borough Police Chief Anthony Hovanec driving an unmarked police car in the opposite direction. The police chief spotted Morgan's expired stickers and turned and followed the car for "a couple hundred feet" with the intention of conducting a traffic stop on the basis of the expired stickers. During the brief time that he followed Morgan's car, Hovanec saw Reppert in the backseat and observed the movement of his head and shoulders, but not his hands. Chief Hovanec later described the movement as suggestive that Reppert was stuffing something into his pockets or between the seat cushions of the car. Hovanec activated police signal lights in the interior of his car, directing Morgan to pull over. Morgan complied and Hovanec approached the car from the rear, stopping at the driver-side window to question Morgan about the stickers. Morgan informed the police chief that another officer had stopped him three days before and allowed him five days in which to have the car inspected. Hovanec accepted Morgan's explanation and did not issue a citation.

¶ 3 During Hovanec's discussion with Morgan, he continued to observe Reppert, who remained seated in the back seat of the car holding on his lap a sandwich that he had been eating prior to the stop. The Chief recalled that Reppert, a nineteen-year-old college student, appeared "antsy" and "very, very nervous," with a "look on his face." He did not recognize Reppert, however, and did not ask his name. Although Reppert's hands remained in plain view throughout the encounter, the Chief ordered him to step out of the car based on suspicion of his head and shoulder movements prior to the stop and his nervous appearance during the stop. When Reppert exited the car, Hovanec saw bulges in the front pockets of his pants and directed him to empty the pockets. Hovanec had not seen the bulges previously. Reppert at first did not comply with the Chief's direction and Hovanec ordered him again to empty his pockets "for your safety and mine." Reppert responded, "I am screwed," but then emptied the pockets, revealing $51 in cash, forty-one grams of marijuana in a baggie, multiple smaller baggies, and a small scale. Hovanec then placed Reppert under arrest, handcuffed him, and seated him in a second police cruiser he had called as back-up. Upon returning to search Morgan's car, Hovanec discovered a sandwich wrapper and the remains of the sandwich Reppert had been eating prior to the stop.

¶ 4 The Commonwealth charged Reppert with Possession of a Controlled Substance, Possession with Intent to Deliver, and Possession of Drug Paraphernalia. *See* 35 P.S. § 780–113(a)(16), (30), (32) (respectively). Reppert filed an Omnibus Pre-trial Motion requesting suppression of both the physical evidence seized during the foregoing stop and his inculpatory statements. The trial court, The Honorable Robert C. Reed, P.J., denied Reppert's motion and, on January 4, 2001, convened a bench trial at which the Commonwealth introduced the allegedly tainted evidence. At the conclusion of trial, Judge Reed found Reppert guilty and, on February 12, 2001, imposed a sentence of three years' probation plus fines and costs. Reppert filed this appeal raising the following question for our review:

> Where, following the conclusion of a routine traffic stop, there was an investigative detention of a back seat passenger who appeared "nervous," "antsy" and who was observed by the arresting officer to have been making furtive movements in the back seat prior to the stop, should the motion to suppress evidence have been granted since the arresting officer could not articulate facts to support a reasonable suspicion that criminal activity was afoot?

Brief for Appellant at 3.

¶ 5 Reppert's question raises the issue of whether the trial court erred in denying his motion to suppress evidence obtained after Chief Hovanec ordered him to alight from the backseat of Morgan's car. "Our standard of review of a denial of suppression is whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error." *Commonwealth v. McClease*, 750 A.2d 320, 323 (Pa.Super.2000). Our scope of review is limited; we may consider "only the evi-dence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." *Commonwealth v. Maxon*, 798 A.2d 761, 765 (Pa.Super.2002). "Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts." *McClease*, 750 A.2d at 323–24 (quoting *In the Interest of D.M.*, 560 Pa. 166, 743 A.2d 422, 424 (1999)).

¶ 6 In this case, the trial court did not enter Findings of Fact on the record; nor did it state its findings in court at the conclusion of the suppression hearing. Accordingly, we are constrained to focus our review on Judge Reed's Memorandum Opinion of April 20, 2001, filed in accordance with Pennsylvania Rule of Appellate Procedure 1925(a). In that Opinion, the court recounted the occurrences detailed above and also cited evidence that when Chief Hovanec conducted the stop at issue, Reppert was under investigation for "narcotics distribution" in Beaver Borough. Trial Court Opinion, 4/20/01, at 5. The court concluded that because Beaver police suspected Reppert of such involvement, Chief Hovanec could proceed on the presumption that he was armed, and lawfully could order him out of the car as a prelude to a *Terry* search. Trial Court Opinion, 4/20/01, at 4–6 (citing *Commonwealth v. Patterson*, 405 Pa.Super. 17, 591 A.2d 1075, 1078 (1991)) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The court concluded further that when Reppert exited the car, Chief Hovanec justifiably relied on the sight of his bulging pockets to augment prior observations of the defendant's nervous demeanor. Trial Court Opinion, 4/20/02, at 6–8. Although the court's discussion does not state expressly when the Chief's interaction with Reppert became an investigatory

detention, the court's reliance on the appearance of Reppert's pockets suggests that it did not consider Reppert seized until after he exited the car.

¶ 7 Reppert faults the court's rationale on two bases, contending first that the court misinterpreted the evidence at the suppression hearing and second that it failed to recognize and apply controlling law. Brief for Appellant at 7, 8. In support of his challenge to the court's findings, Reppert argues that the court erred in treating the pendency of a drug investigation as a contributing factor in Chief Hovanec's decision to detain him. Brief for Appellant at 7. Reppert contends that evidence adduced at the suppression hearing established that the Chief did not suspect him of selling of drugs and did not rely on knowledge of a drug investigation in determining whether to detain him. Brief for Appellant at 7. In support of his challenge to the court's legal conclusions, Reppert argues that the court failed to recognize the point at which his encounter with Chief Hovanec arising out of the original traffic stop became an investigatory detention. Brief for Appellant at 8. Reppert contends that his detention began, not as the court suggested, after Chief Hovanec ordered him to empty his pockets, but at the moment when the Chief ordered him out of the car. Brief for Appellant at 8. Reppert reasons accordingly that Chief Hovanec conducted his detention merely on the basis of the "furtive" movements and nervous demeanor he had observed to that point and, therefore, acted illegally. Following scrutiny of the certified record and the law, we agree. We conclude that the trial court erred both in assessing the evidence at the suppression hearing and in failing to follow controlling appellate decisions that prescribe the point at which a seizure commences and the level of suspicion necessary to meet Constitutional muster.

¶ 8 The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect citizens from "unreasonable searches and seizures, including those entailing only a brief detention." *Commonwealth v. Strickler*, 563 Pa. 47, 757 A.2d 884, 888 (2000). *See also Commonwealth v. Morris*, 422 Pa.Super. 343, 619 A.2d 709, 711 (1992). To secure the right of citizens to be free from such intrusions, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty. *See Commonwealth v. Beasley*, 761 A.2d 621, 624 (Pa.Super.2000). For this purpose, our Supreme Court has defined three forms of police-citizen interaction: a mere encounter, an investigatory detention, and a custodial detention. *See Commonwealth v. Boswell*, 554 Pa. 275, 721 A.2d 336, 340 (1998). A mere encounter between the police and a citizen during which an officer merely questions the citizen without suggestion of coercion, carries no official compulsion on the part of the citizen to stop or to respond and, consequently, need not be supported by any level of suspicion. *See Beasley*, 761 A.2d at 624. If, however, the police presence becomes too intrusive, a mere encounter may be regarded as an investigatory detention or seizure. *See id.*

¶ 9 To determine whether a mere encounter rises to the level of an investigatory detention, we must discern whether, as a matter of law, the police conducted a seizure of the person involved. *See Commonwealth v. Mendenhall*, 552 Pa. 484, 715 A.2d 1117, 1119–20 (1998). To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine whether the demeanor and conduct of the

police would have communicated to a reasonable person that he or she was not free to decline the officer's request or otherwise terminate the encounter. *See Maxon,* 798 A.2d at 766. "Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a reasonable [person] innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes." *Beasley,* 761 A.2d at 625 (citing *Commonwealth v. Matos,* 543 Pa. 449, 672 A.2d 769, 773 (1996) (quoting *Commonwealth v. Jones,* 474 Pa. 364, 378 A.2d 835, 840 (1977))).

 ¶ 10 On multiple occasions, our Courts have applied this standard in the context of motor vehicle stops during which police have ordered a motorist or his passengers to disembark. *See Commonwealth v. Freeman,* 563 Pa. 82, 757 A.2d 903, 906-07 (2000); *Commonwealth v. Sierra,* 555 Pa. 170, 723 A.2d 644, 646 (1999) (plurality opinion); *Commonwealth v. Donaldson,* 786 A.2d 279, 285-86 (Pa.Super.2001); *Commonwealth v. Lopez,* 415 Pa.Super. 252, 609 A.2d 177, 181-82 (1992); *Commonwealth v. Elliott,* 376 Pa.Super. 536, 546 A.2d 654, 660 (1988). Our Supreme Court has recognized expressly that an officer conducting a valid traffic stop may order the occupants of a vehicle to alight to assure his own safety. *See Freeman,* 757 A.2d at 907 n. 4 (citing *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) and *Maryland v. Wilson,* 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997)). Once the primary traffic stop has concluded, however, the officer's authority to order either driver or occupant from the car is extinguished. *See Sierra,* 723 A.2d at 647 (citing *Parker,* 619 A.2d at 738) (limiting police authority following a traffic stop). Thus, if subsequently the officer directs or requests the occupants to exit the vehicle,

his show of authority may constitute an investigatory detention subject to a renewed showing of reasonable suspicion. *See Donaldson,* 786 A.2d at 285 n. 4 (concluding that officer's "request" following conclusion of traffic stop, that driver exit vehicle, could not be viewed as discretionary and therefore constituted investigatory detention).

 ¶ 11 The matter of when a traffic stop has concluded or otherwise given way to a new interaction does not lend itself to a "brightline" definition. Thus, in *Freeman,* our Supreme Court defined multiple relevant circumstances on the basis of which we may recognize the end of a traffic stop and the commencement of another interaction. *See* 757 A.2d at 906-07. The Court enumerated the following circumstances:

> the existence and nature of any prior seizure; whether there was a clear and expressed endpoint to any such prior detention; the character of police presence and conduct in the encounter under review (for example—the number of officers, whether they were uniformed, whether police isolated subjects, physically touched them or directed their movement, the content or manner of interrogatories or statements, and "excesses" factors [sic] stressed by the United States Supreme Court); geographic, temporal and environmental elements associated with the encounter; and the presence or absence of express advice that the citizen-subject was free to decline the request for consent to search.

*Id.*

 ¶ 12 Upon consideration of these circumstances as documented in the record of the suppression hearing, we conclude that the prior traffic stop in this case gave way to a new interaction when Chief Hovanec directed Reppert to exit Morgan's car.

The record establishes, initially, that Chief Hovanec effected the traffic stop for one purpose; i.e. to address the infraction of the Motor Vehicle Code posed by the car's expired inspection and registration stickers. N.T., 8/31/01, at 4, 8. When the Chief effected the stop he questioned Morgan, accepted his explanation, and interacted with Morgan no further. N.T., 8/31/01, at 9–10. Hence, the traffic stop had concluded. Although the record does not establish that Chief Hovanec apprised Morgan of a clear end to the stop, we do not find this discrepancy controlling. The Chief had realized the purpose for the stop and had no further reason to detain the driver of the vehicle or its occupants under the guise of the original traffic infraction. *See Freeman,* 757 A.2d at 907 (indicating that once police officer has accomplished purpose of a traffic stop motorist is entitled to leave); *see also Sierra,* 723 A.2d at 647 (citing *Commonwealth v. Parker,* 422 Pa.Super. 393, 619 A.2d 735, 738 (1993)) (limiting police authority following a traffic stop to issuing citation or warning). Chief Hovanec's subsequent direction to Reppert to exit the car was unrelated to any traffic infraction and was not a necessary element of the prior traffic stop. N.T., 8/31/00, at 19 (indicating that Chief Hovanec ordered Reppert out of the car on the basis of preceding head and shoulder movements). Consequently, we conclude, based on the acknowledged limitations of the traffic stop and the Chief's redirection of his inquiries to a person other than the driver, for purposes unrelated to the documented traffic infraction, that the Chief's direction to Reppert to exit the car constituted a new interaction. *See Freeman,* 757 A.2d at 907.

¶ 13 Moreover, the coercive circumstances of this new interaction compel our conclusion that Reppert had in fact been seized at the moment Chief Hovanec ordered him from the car. Under analogous circumstances we have recognized that an officer's direction to a *driver* to alight from a motor vehicle after a traffic stop involves a display of authority substantially similar to the prior stop of the auto itself. *See id.; Donaldson,* 786 A.2d at 285. We recognized that this second display of authority, measured against the background of a prior stop readily established the existence of a seizure. *See Freeman,* 757 A.2d at 907; *Donaldson,* 786 A.2d at 285. The same conclusion is apparent here. Chief Hovanec displayed substantial coercive authority at the commencement of the traffic stop when he directed Morgan's car to the side of the road, and subsequently, when he ordered Reppert to alight. As we observed in *Donaldson,* "it would be disingenuous to assert that a reasonable person in Appellant's shoes would have felt free to leave the scene had he wished to." *Id.* "[T]he reality of the matter is that when a police officer requests a citizen to do something, even something as simple as 'move along' it is most often perceived as a command that will be met with an unpleasant response if disobeyed." *Commonwealth v. DeHart,* 745 A.2d 633, 638 (Pa.Super.2000) (citation omitted). Accordingly, we conclude that Reppert had been effectively seized at the moment Chief Hovanec ordered him to exit Morgan's car. We must therefore determine whether Reppert's prior behavior afforded the Chief sufficient basis for such a seizure.

¶ 14 Our Supreme Court has mandated that law enforcement officers, prior to subjecting a citizen to an investigatory detention, must harbor at least a reasonable suspicion that the person seized is then engaged in unlawful activity. *See Commonwealth v. Polo,* 563 Pa. 218, 759 A.2d 372, 375 (2000). The question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totali-

ty of the circumstances to determine whether the officer who initiated the stop had a *"particularized and objective basis"* for suspecting the individual stopped. *Commonwealth v. Ayala*, 791 A.2d 1202, 1209 (Pa.Super.2002) (quoting *In re D.M.*, 566 Pa. 445, 781 A.2d 1161, 1163 (2001)). Thus, to establish grounds for reasonable suspicion, the officer must articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. *See Commonwealth v. Cook*, 558 Pa. 50, 735 A.2d 673, 677 (1999).

¶ 15 Although a police officer's knowledge and length of experience weigh heavily in determining whether reasonable suspicion existed, our Courts remain mindful that the officer's judgment is necessarily colored by his or her primary involvement in "the often competitive enterprise of ferreting out crime." *In re D.E.M.*, 727 A.2d 570, 578 n. 19 (Pa.Super.1999) (quoting *Terry* 392 U.S. at 11–12, 88 S.Ct. 1868). Therefore, the fundamental inquiry of a reviewing court must be an objective one, "namely, whether 'the facts available to the officer at the moment of the [intrusion] warrant a man of reasonable caution in the belief that the action taken was appropriate.'" *Commonwealth v. Zhahir*, 561 Pa. 545, 751 A.2d 1153, 1156 (2000) (quoting *Terry*, 392 U.S. at 21–22, 88 S.Ct. 1868) (insertion in *Zhahir*). *This inquiry will not be satisfied by an officer's hunch or unparticularized suspicion. See Commonwealth v. Arch*, 439 Pa.Super. 606, 654 A.2d 1141, 1144 (1995).

¶ 16 In this case, the trial court concluded that Chief Hovanec acted on reasonable suspicion based on: (1) his observation of Reppert's head and shoulder movements prior to the traffic stop; (2)

Reppert's "very, very nervous" appearance during the stop; (3) the bulges in Reppert's front pockets, and (4) the pendency of a drug investigation by Beaver police in which Reppert was allegedly implicated. Trial Court Opinion, 4/20/01, at 3. We conclude, initially, that the court failed to recognize the point at which Chief Hovanec's interaction with Reppert became a seizure and erred, therefore, in considering the appearance of Reppert's pockets as a circumstance from which the Chief could have drawn reasonable suspicion of involvement in criminal activity. At the "moment of the intrusion" at issue in this case; i.e. at the point when Chief Hovanec ordered Reppert from the car, *see Zhahir*, 751 A.2d at 1156, he had not seen Reppert's pockets. Chief Hovanec so acknowledged in his own testimony. N.T., 8/31/00, at 20. The Chief acknowledged that, in point of fact, Reppert's pockets were not visible from outside the car as his lap was covered with a sandwich throughout the traffic stop. N.T., 8/31/00, at 15. Because the Chief had not seen and could not rely on the appearance of Reppert's pockets when he ordered him to exit the car, the court erred in concluding that the bulging of the pockets contributed to the existence of reasonable suspicion.

¶ 17 Moreover, the court erred in finding reasonable suspicion based on the reported drug investigation of which Reppert was an alleged target. This conclusion is pointedly contradicted by the record. The evidence adduced during the suppression hearing establishes that Chief Hovanec was not aware of Reppert's alleged role in the sale of drugs until after he conducted the stop at issue. N.T., 8/31/00, at 16–17. Although the Chief was aware of an ongoing investigation, and that someone named "Reppert" had been a target of the investigation, he was not aware of Reppert's identity when he ordered him

to step out of the car. N.T., 8/31/01, at 16. The Chief attested that, in point of fact, he had not known Reppert when he conducted the stop, had not seen photos of Reppert, and did not ask Reppert's name until after he directed him to alight. N.T., 8/31/01, at 16–17. Thus, the trial court's suggestion that Chief Hovanec relied on Reppert's alleged profile in a "narcotics" investigation finds no support in the Commonwealth's evidence.

¶ 18 Chief Hovanec's remaining observations were limited to Reppert's "furtive" head and shoulder movements observed through the back window of Morgan's moving car, and Reppert's nervous or "antsy" appearance during the traffic stop. N.T. 8/31/00, at 5, 18. Our courts have determined, on several occasions, that neither furtive movements nor excessive nervousness provide a sufficient basis upon which to conduct an investigatory detention. See Sierra, 723 A.2d at 647; Commonwealth v. DeWitt, 530 Pa. 299, 608 A.2d 1030, 1033 (1992); McClease, 750 A.2d at 326; DeHart, 745 A.2d at 637.

¶ 19 In Sierra, our Supreme Court addressed the legality of a motor vehicle search following a valid traffic stop where, as here, the detaining officer premised the search on observations he had made during the stop. See Sierra, 723 A.2d at 647. In the underlying incident, a Pennsylvania State Trooper had stopped a vehicle for speeding shortly after midnight. See id. at 645. During the stop, the trooper observed that the car carried dealer license plates and contained boxes of motorcycle parts. See id. When the trooper asked the driver for appropriate documentation, he noted that the driver's license had expired, the driver had a gang tattoo under his left eye, and that the driver and his passenger "appeared to be more nervous than most people would be during a routine traffic stop." Id. at 645, 647. Accord-

ingly, the trooper asked if the driver had anything illegal in the car. See id. at 645. The driver denied any such cargo and the trooper returned to his own car to check the driver's license and the vehicle's documentation. See id. Returning to the car, the trooper issued a written warning for speeding and then asked the driver again if he had anything illegal in the car. See id. The driver replied, "No, would you like to look?," whereupon the officer ordered the men to exit the car and conducted a pat-down for weapons. See id. The pat-down revealed the passenger's possession of an unlicensed firearm. See id. On review, the Supreme Court determined that because the traffic stop had concluded, the trooper could conduct a subsequent detention only upon his observations of the contents and occupants of the car unrelated to the reasons for the traffic stop. See id. at 647. Accordingly, the Court considered the excessive nervousness of the vehicle's occupants, the unlikely appearance of dealer plates on the car, and the presence of motorcycle parts that the trooper believed to be stolen. See id. The Court reached a forceful conclusion, that, "[n]one of the officer's observations demonstrate, or even suggest, illegal activity." Id. Citing Sierra, we enunciated in DeHart, that "a police officer's assessment that the occupants of a vehicle appear nervous does not provided reasonable suspicion for an investigative detention." DeHart, 745 A.2d at 637.

¶ 20 In DeWitt, the Supreme Court addressed another scenario premised in part on the "furtive movements" of vehicle occupants, considered together with other allegedly suspicious circumstances. See DeWitt, 608 A.2d at 1032. In that case, the defendant had been seated in a parked car with others when the police approached the car, ostensibly to investigate the potential involvement of the occupants

in criminal activity reported in that area. *See id.* As the police neared the vehicle, they observed the occupants inside making "furtive movements and suspicious movements as if they were trying to hide something." *See id.* When the officers reached the car, the defendant attempted to flee and the officers gave chase. *See id.* When the officers captured and searched the defendant, they discovered on his person marijuana, other controlled substances, and drug paraphernalia. *See id.* On review, our Supreme Court held that even the combined circumstances of furtive movements, late time of night, previous reports of criminal activity in the area, and flight, did not establish an adequate basis for reasonable suspicion. *See id.* at 1034. Accordingly, the Court ordered suppression of the evidence of contraband seized from the defendant's person. *See id.* Citing *DeWitt*, we concluded in *McClease*, that a motorist's furtive movements on the approach of police, even late at night in an area of reported criminal activity, did not establish reasonable suspicion for an investigatory detention. *See McClease*, 750 A.2d at 326.

¶ 21 Upon comparing the facts in this case to those in the foregoing cases, we find no circumstances sufficient to demonstrate reasonable suspicion. In *Sierra* and *DeHart*, our Courts pronounced an officer's assessment of nervous demeanor palpably insufficient to establish reasonable suspicion of a citizen's involvement in criminal activity, even when viewed in combination with other indicia of potential criminal acts. *See Sierra*, 723 A.2d at 647; *DeHart*, 745 A.2d at 637. We have found furtive movements similarly deficient even when they occur in high crime environments in the late hours of the night. *See DeWitt*, 608 A.2d at 1034; *McClease*, 750 A.2d at 326. Thus, we find no basis to conclude that excessive nervousness and furtive movements, even considered to-

gether, give rise to reasonable suspicion of criminal activity. A police officer's observation of a citizen's nervous demeanor and furtive movements, without more, establishes nothing more than a "hunch," employing speculation about the citizen's motive in the place of fact. Were we to validate such a practice, we would open every occupant of a motor vehicle in this Commonwealth to law enforcement officers' wholly subjective interpretation of inoffensive conduct, and undermine our Supreme Court's time-honored insistence that police officers may stop our citizens only on the basis of objective criteria. *See Sierra*, 723 A.2d at 647; *DeWitt*, 608 A.2d at 1034. This we cannot do. This we will not do.

¶ 22 We conclude accordingly that the seizure of Benjamin Reppert at issue in this case was illegal. The trial court erred in failing to recognize that illegality and in failing to order suppression of the physical evidence and incriminating statements it produced. Consequently, we reverse Reppert's judgment of sentence and order the foregoing evidence suppressed.

¶ 23 Judgment of sentence **REVERSED**. Case **REMANDED** for further proceedings consistent with this Opinion. Jurisdiction **RELINQUISHED**.

¶ 24 Concurring Opinion by KLEIN, J.

¶ 25 Concurring Opinion by GRACI, J., in which Judge ORIE MELVIN joins.

¶ 26 Judge HUDOCK concurs in the result.

KLEIN, J., Concurring.

¶ 1 I concur in the result reached by the majority, but do not join in the majority's reasoning.

¶ 2 Even if the investigation were continuing when Chief Hovanec ordered Rep-

pert out of the car, and there were reasonable grounds to suspect him of dealing illegal drugs, at most Chief Hovanec could have conducted a Terry stop.[1] With the level of suspicion Chief Hovanec possessed, just as it would have been improper for him to go beyond a Terry frisk and search Reppert himself, it was equally improper to order Reppert to empty his pockets. The officer cannot accomplish the illegal search by indirect means. In this respect, I agree with Judge Graci.

¶ 3 If the appeal could not be disposed of on this basis, I believe we would have to remand to the trial court for clear findings of fact. Based on the state of the record, we do not know whether the police investigation for the expired sticker was ongoing or had concluded. While it is true that when reviewing an order denying a motion to suppress we "may only consider the Commonwealth's evidence and the defendant's evidence that remains uncontradicted," *Commonwealth v. Nobalez*, 805 A.2d 598, 600 (Pa.Super.2002), that standard does not give this Court the authority to find facts. Rather, that is the standard by which we judge the trial court's findings of fact and conclusions of law. More fully stated, the standard is, "When reviewing an order denying a motion to suppress evidence, we must determine whether the evidence of record supports the factual findings of the trial court. In making this determination, this court may only consider the Commonwealth's evidence and the defendant's evidence that remains uncontradicted." *Id.* (citations omitted). In the context of an appeal, we cannot find facts.

¶ 4 In this case, because the trial judge did not state on the record his findings of fact and conclusions of law as required by Pa.R.Crim.P. 581(*l*), material fact questions remain unresolved. Since the testimony about whether Chief Hovanec ordered Reppert out of the car before or after he realized who Reppert was is contradictory, we cannot determine whether the Chief's acts were proper.

¶ 5 Chief Hovanec testified that he ordered Reppert out of the car because of his early observations and the fact that he was "acting very nervous" (N.T. 8/31/00 at 5, RR 15a) and that he did not know his name until he was out of the car (N.T. 8/31/00 at 16–17, RR 26d–27a). According to the Chief's own testimony, the expired-sticker investigation was over by the time he ordered Reppert out of the car. N.T. 8/31/00 at 9, RR 19a.

¶ 6 In direct contradiction, the driver of the car, Justin Morgan, testified that right after Morgan explained that he had already been stopped for the inspection sticker, Chief Hovanec asked who was in the back seat. Reppert answered, "Ben Reppert" (N.T. 8/31/01, at 35–36, RR 45d–46d). The Chief knew Reppert's father and knew Ben was under a drug investigation. Defendant Ben Reppert also testified that he gave his name *before* he was ordered out of the car, after Chief Hovanec asked if he had put anything under the seat and asked him his name. (N.T. 8/31/02, at 41–42, RR 51a–52a).

¶ 7 If Chief Hovanec ordered Reppert out before realizing Reppert was under a drug investigation, the further investigation and order to get out of the car was improper. The case law provides that "antsy" movements and acting nervous do not in and of themselves justify a Terry stop. *Commonwealth v. Boyer*, 455 Pa. 283, 314 A.2d 317 (1974). However, certainly it was no violation to ask Reppert's name. At that point, the Chief would have realized that the passenger was under a drug investigation. That fact, combined

1. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

with the other factors, would have rendered ordering him out of the car proper.

¶ 8 But we cannot resolve that conflict. That function lies with the trial court, which presents an interesting circumstance. If the trial judge believes the Commonwealth's witness, the further investigation was improper. On the other hand, if the trial judge believes the testimony of Reppert and the other defense witness, the further investigation was proper.

¶ 9 As the majority notes, courts often say that in reviewing the denial of a suppression motion, the appellate courts may consider "only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." *See, e.g., Commonwealth v. McClease,* 750 A.2d 320, 323 (Pa.Su-

per.2000). Normally, that means the uncontradicted evidence for the defense that goes *against* the Commonwealth. Here, there is *contradicted* defense evidence that *favors* the Commonwealth: that the Chief did not order Reppert out of the car until after he found out his name and remembered he was a drug suspect.

¶ 10 The sensible interpretation of the rule is that when reviewing the denial of a motion to suppress, we look at all of the evidence in the light most favorable to the Commonwealth and determine whether the record supports the suppression court's findings of fact. We then review the legal conclusion of admissibility *de novo*. This restatement of the rule is particularly apt since the boilerplate remark reminds courts to consider the evidence "in the context of the record as a whole." This view is supported by the weight of authority from other American courts.[2]

2. Although using different phraseology, most jurisdictions examine the suppression court's findings of fact by referring to the whole suppression record and seeing if the evidence supports the suppression court's findings. *See, e.g., United States v. Twomey,* 884 F.2d 46, 51–52 (1st Cir.1989) (reviewing findings of fact for clear error); *United States v. Reyes,* 283 F.3d 446, 450 (2d Cir.2002) (reviewing findings of fact for clear error, construing evidence in light most favorable to government); *United States v. Myers,* 308 F.3d 251, 255 (2002) ("We construe the record in the light most favorable to the government."); *United States v. Seidman,* 156 F.3d 542, 547 (4th Cir.1998) ("[I]n reviewing the denial of a motion to suppress, we review the evidence in the light most favorable to the government."); *United States v. Santiago,* 310 F.3d 336, 339–40 (2002) (reviewing evidence in light most favorable to government); *United States v. Johnson,* 242 F.3d 707, 709 (6th Cir.2001) (viewing evidence "in the light most likely to support the district court's decision."); *United States v. Lomeli,* 76 F.3d 146, 149 (7th Cir.1996) (reviewing for clear error); *United States v. Smith,* 266 F.3d 902, 904 (8th Cir. 2001) ("We review *de novo* the trial court's ruling on a motion to suppress, 'evaluating only for clear error, however, any findings of

fact by the trial court and giving appropriate deference to the inferences apparently drawn from those facts by law enforcement officers, the court that issued the search warrants, and the trial court' " (citation omitted)); *United States v. Chavez–Miranda,* 306 F.3d 973, 977 (9th Cir.2002) (reviewing findings of fact for clear error), *United States v. McKissick,* 204 F.3d 1282, 1296 (10th Cir.2000) ("When reviewing a district court's denial of a motion to suppress, we consider the totality of the circumstances and view the evidence in a light most favorable to the government."); *United States v. Holloway,* 290 F.3d 1331, 1334 (11th Cir.2002) (reviewing findings of fact for clear error), *United States v. Davis,* 344 U.S.App. D.C. 212, 235 F.3d 584, 586 (D.C.Cir.2000) (reviewing findings of fact for clear error); *State v. Joubert,* 20 P.3d 1115, 1118 (Alaska 2001) (reviewing denial of suppression motion in light most favorable to upholding trial court's decision; reversing findings of fact for clear error only); *Ilo v. State,* 350 Ark. 138, 85 S.W.3d 542, 546–47 (2002) (reviewing evidence in denial of motion to suppress in light most favorable to state); *People v. Shaw,* 97 Cal.App.4th 833, 118 Cal.Rptr.2d 678, 681 (2002) (reviewing suppression court's findings of fact under substantial evidence standard); *State v. Jackson,* 73 Conn.App. 338, 808 A.2d

¶ 11 The suppression judge, as trier of fact, can believe the testimony of defense witnesses, disbelieve the Commonwealth's witnesses, and if the defense testimony supports admission, find for the Commonwealth. On review, we look at the evidence in the light most favorable to the Commonwealth. In the usual case, Pennsylvania's boilerplate standard will achieve that goal. This is the unusual case, where the defense witnesses have supported the Commonwealth's argument.

¶ 12 As explained above, without findings of fact, I do not believe we can resolve whether ordering Reppert out of the car was proper. However, even if the Chief could properly order Reppert out of the car, he could not order him to empty his pockets. For that reason, reversal is in order, and I concur.

GRACI, J., Concurring.

¶ 1 While I am reluctant to disagree with the analysis set forth in the majority opinion, under the facts presented here, as I understand them, I am unable to join. Accordingly, I concur only in the result.

¶ 2 Here, there is no question that the car in which appellant, Benjamin R. Reppert ("Reppert"), was a passenger was lawfully stopped for a violation of the Mo-

388, 413 (2002) (reversing suppression court's findings of facts for abuse of discretion or for injustice, giving "every reasonable presumption in favor of the trial court's ruling"); *McAllister v. State*, 807 A.2d 1119, 1123 (Del.Super.2002) (reversing suppression court's findings of fact only if "not the result of a logical and orderly deductive process"); *Chavez v. State*, 832 So.2d 730, 748–49 (2002) (deferring to suppression court on questions of fact); *Rogers v. State*, 253 Ga.App. 863, 560 S.E.2d 742, 743 (2002) (construing evidence in light most favorable to trial court's decision, and reversing findings only if clearly erroneous); *State v. Edwards*, 96 Hawai'i 224, 30 P.3d 238, 245 (2001) (reviewing suppression court's findings of fact under clearly erroneous standard); *State v. Doe*, 137 Idaho 519, 50 P.3d 1014, 1017 (2002) (reviewing suppression court's findings of fact for clear error); *People v. DeLuna*, 334 Ill.App.3d 1, 267 Ill.Dec. 778, 777 N.E.2d 581, 586–87 (2002) (reversing suppression court's findings of fact only if against manifest weight of the evidence); *Nathan v. State*, 370 Md. 648, 805 A.2d 1086, 1093 (2002) (reviewing findings of fact in light most favorable to the prevailing party); *State v. Potter*, 72 S.W.3d 307, 313 (Mo.Ct.App.2002) (reviewing findings of fact for clear error), *State v. Padilla*, 321 N.J.Super. 96, 728 A.2d 279, 284 (App.Div.1999) (reviewing suppression court's decision for sufficiency of the evidence, giving "due deference" to trial judge's credibility determinations); *State v. Romero*, 132 N.M. 364, 48 P.3d 102, 104 (App.2002) (reviewing findings of fact under substantial evidence standard); *People v. Velazquez*, 73 N.Y.2d 815, 537 N.Y.S.2d 112, 534 N.E.2d 29, 30 (1988) (reviewing for sufficiency of the evidence), *State v. Carr*, 2002 WL 1881158, at *2 (Ohio Ct. App. Aug.16, 2002) ("[W]e are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence."); *State v. Ehly*, 317 Or. 66, 854 P.2d 421, 427 (1993) (reviewing suppression court's findings of fact for sufficiency of evidence); *State v. Hullinger*, 649 N.W.2d 253, 256 (S.D.2002) (reviewing suppression court's findings of fact for clear error); *State v. Levitt*, 73 S.W.3d 159, 169 (Tenn.Crim.App.2001) (reviewing findings of fact under weight of evidence standard); *Carmouche v. State*, 10 S.W.3d 323, 327–28 (Tex.Crim.App.2000) ("When the trial court does not make explicit findings of historical fact, we review the evidence in the light most favorable to the trial court's ruling."); *State v. Galvan*, 37 P.3d 1197, 1198 (Utah Ct.App.2001) (reviewing findings of fact for clear error); *Sheler v. Commonwealth*, 38 Va.App. 465, 566 S.E.2d 203, 206 (2002) (reviewing evidence in light most favorable to Commonwealth), *State v. Hill*, 123 Wash.2d 641, 870 P.2d 313, 316 (1994) (reviewing suppression court's findings of facts under substantial evidence test); *Allen v. State*, 43 P.3d 551 (Wyo.2002) (reviewing findings of fact for clear error). *But see Roehling v. State*, 776 N.E.2d 961 (Ind.Ct.App. 2002) (stating that court considers conflicting evidence in light most favorable to the state, and uncontradicted evidence in the light most favorable to defendant.)

tor Vehicle Code.[3] At that point Chief Hovanec of the Beaver Borough Police Department was authorized, under both the Pennsylvania and the United States Constitution, to order Reppert, the car's driver, and the other passenger to alight from the car. *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)(driver); *Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997)(extending *Mimms* to passengers); *Commonwealth v. Rodriguez,* 695 A.2d 864, 871 (Pa.Super.1997) (following *Wilson* and rejecting argument that Pennsylvania Constitution provides greater protection for passengers in this circumstance as "meritless"). When there is a lawful traffic stop (as was conceded here), an order by a police officer for the driver and passengers to exit the vehicle is reasonable and needs no further justification. *Rodriguez,* 695 A.2d at 869, *citing Wilson* and *Commonwealth v. Brown,* 439 Pa.Super. 516, 654 A.2d 1096 (1995).

¶ 3 Here, it is clear that Chief Hovanec did not invoke the full extent of his authority when he first pulled the vehicle over. I am unable to conclude, however, that by the time he ordered Reppert from the car, the traffic stop had otherwise reached a clearly articulated endpoint. *See Commonwealth v. Strickler,* 563 Pa. 47, 757 A.2d 884, 900 (2000); *Commonwealth v. Freeman,* 563 Pa. 82, 757 A.2d 903, 907 (2000). There was no objective indication or any articulation that the driver of the vehicle was free to drive off before the chief ordered Reppert to get out of the car. There was no appreciable time lapse, on this record, between the chief's questioning of the driver and his order to Reppert to exit the vehicle. They were of one part.[4] An objective view of the totality of the circumstances yields the inescapable conclusion that the initial, lawful traffic stop had not come to an end when Reppert was ordered from the car. Accordingly, different from the majority, I conclude that Reppert's "seizure" was ongoing from the time of the initial lawful vehicle stop and included the lawful order to exit the car.[5]

¶ 4 My conclusion that the stop was and continued to be lawful when Reppert was ordered from the car does not end the inquiry, however.[6] While *Mimms* and its

---

3. Reppert's attorney conceded this point at oral argument.

4. Chief Hovanec's testimony that his interaction with the driver had "pretty much" come to an end before he ordered Reppert from the car, N.T., 8/31/00, at 9, does not alter this conclusion.

5. Given my view of this case, discussion of cases requiring a reasonable, articulable suspicion that criminal activity is afoot is unnecessary since those cases deal with the legality of the initial stop. In *Commonwealth v. Donaldson,* 786 A.2d 279 (Pa.Super.2001), for instance, which is relied on substantially by the majority, the defendant was not lawfully stopped for a traffic offense. Accordingly, the initial stop required a justification under *Terry.* On the facts presented, that court concluded that the stop was illegal as not being supported by reasonable suspicion. Since the stop here was lawful at its inception, cases like *Donaldson* provide no guidance.

6. It could be argued that a determination that the seizure was lawful ends our inquiry. Reppert's "Statement of Question Involved" appears to center on the invalidity of the "investigative detention" of Reppert after the conclusion of the "routine traffic stop." He frames the question in terms of a lack of "reasonable suspicion that criminal activity was afoot" to justify what he argues was a subsequent "investigative detention." He asserts that the resulting search flowed from the illegal investigative detention. Substituted Brief for Appellant, at 3. However, he argues, *inter alia,* that there were insufficient facts to yield the conclusion, required for a frisk, that Reppert was armed and dangerous. *Id.* at 15–18. In its Rule 1925 opinion, Pa. R.A.P. 1925(a), the suppression court, after identifying Reppert's first issue on appeal as

progeny allow ordering passengers of lawfully stopped vehicles from their cars, they do not allow a "frisk" or "pat down" of the person so ordered. Any such police conduct requires an independent justification. *Commonwealth v. Sierra,* 555 Pa. 170, 723 A.2d 644, 648 n. 6 (1999)(opinion in support of affirmance)(*citing Mimms,* 434 U.S. at 111–12, 98 S.Ct. 330)("Once the occupants have alighted, the officer may conduct a pat-down search for weapons if the officer concludes that the occupants may be armed and dangerous."); *Commonwealth v. Shiflet,* 543 Pa. 164, 670 A.2d 128, 132 (1995)(search of passenger's purse, where there was no reason to believe criminal activity was afoot or that she was armed and dangerous, was improper).[7] Here, Chief Hovanec had a reasonable, articulable suspicion to believe that Reppert might be armed and dangerous. Accordingly, the chief would have been justified in frisking Reppert.

¶ 5 As we have regularly said, in "[d]etermining whether a reasonable suspicion exists requires an assessment of the totality of the circumstances. These circumstances are viewed through the eyes of a trained officer, not an ordinary citizen." *Commonwealth v. Fink,* 700 A.2d 447, 449 (Pa.Super.1997); *In re N.L.,* 739 A.2d 564, 567 (Pa.Super.1999)(same); *Common-*

*wealth v. Johnson,* 734 A.2d 864, 869 (Pa.Super.1999)(same), *See also Commonwealth v. Nobalez,* 805 A.2d 598, 600 (Pa.Super.2002) (assessing totality of circumstances to determine probable cause to arrest, "not as a layperson, but through the eyes of a trained police officer"). We consider the officer's experience in making this assessment. *Nobalez,* 805 A.2d at 599 (observing that arresting officer was "highly experienced" after being on the force for nine years). We view the evidence through the eyes of a trained officer notwithstanding the fact that the officer is involved in "the often competitive enterprise of ferreting out crime." *In re D.E.M.,* 727 A.2d 570, 578 n. 19 (Pa.Super.1999) (quoting *Terry* at 11–12, 88 S.Ct. 1868). The record in this case leads me to conclude that Chief Hovanec was not acting on a hunch but that he had the requisite suspicion to frisk Reppert.[8]

¶ 6 The chief, a 29–year law enforcement veteran, N.T., 8/31/00, at 14, observed Reppert making furtive movements in the back seat of the car in which he was a passenger. The movements were consistent, based on the chief's experience, with the person trying to hide something, *id.,* by either "stuffing something in his trousers or into the back seat of the car." *Id.* at 5. After the car was stopped, Reppert was

"[w]hether [the suppression c]ourt's denial of [Reppert's] motion to suppress evidence was in error," Memorandum Opinion, 4/21/01, at 2, spent a substantial portion of its opinion discussing the standard for a "frisk" and the propriety of a "frisk" under the circumstances presented in this case. *Id.* at 3–7. The Commonwealth, in its brief to this court, likewise discusses the propriety of a "frisk" under the facts presented here. Commonwealth's Substituted Brief, at 9–14. Accordingly, the challenge to the propriety of the actions following the stop has not been waived and is properly before us.

7. Indeed, *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), itself speaks of a

separate justification for a "stop" (reasonable, articulable suspicion that criminal activity is afoot) and for a "frisk" (reasonable, articulable suspicion that person stopped may be armed and dangerous). Our cases have recognized these distinct requirements. *See In the Interest of N.L.,* 739 A.2d 564 (Pa.Super.1999); *In the Interest of C.C.,* 780 A.2d 696 (Pa.Super.2001).

8. In assessing the record, I consider only the Commonwealth's evidence and the defendant's evidence that remains uncontradicted. *Nobalez,* 805 A.2d at 600, *citing Commonwealth v. Jackson,* 451 Pa.Super. 129, 678 A.2d 798, 800 (1996).

"very, very nervous." *Id.* at 5, 18. He was "very antsy." *Id.* He was moving around in the back seat during Chief Hovanec's brief interaction with the driver. *Id.* at 18. He properly ordered Reppert out of the car. *Id.* at 5. As he alighted, the chief saw that Reppert's front pockets "had large bulges." *Id.* at 6. At that point, Reppert told the chief his name. *Id.* at 16. When he heard Reppert's name, the chief said: "We have been looking for you." *Id.* at 30.[9] The chief was aware of an open drug investigation in his department concerning Reppert. *Id.* at 16. Upon seeing the bulges in Reppert's pockets Chief Hovanec, based on his experience, became concerned for his safety. Id. at 6.[10]

¶ 7 Based on a totality of the circumstances as seen through the eyes of a 29 year police veteran, it would have been objectively reasonable for Chief Hovanec to frisk Reppert (who was, as explained above, subject to a valid vehicle stop). It was likewise permissible for the chief to ask Reppert if he had anything in his pockets that might harm the chief while conducting the limited pat down permitted under *Terry*. *Commonwealth v. Kondash*, 2002 PA Super 309, 808 A.2d 943 (2002), *citing Commonwealth v. Bowers*, 400 Pa.Super. 377, 583 A.2d 1165, 1170 (1990)(*citing New York v. Quarles*, 467 U.S. 649, 655–659, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)).

¶ 8 Here, however, the chief exceeded the current bounds of *Terry* and *Kondash*. *Terry* allows a limited pat down of the outer clothing of a detained individual to determine if he or she is armed and dangerous. *Minnesota v. Dickerson*, 508 U.S. 366, 373; 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *Commonwealth v. E.M.*, 558 Pa. 16, 735 A.2d 654, 659, 661 (1999); *Commonwealth v. Marconi*, 408 Pa.Super. 601, 597 A.2d 616, 619–620 (1991). A *Terry* frisk or pat down is not a search for evidence or contraband. *Commonwealth v. Zhahir*, 561 Pa. 545, 751 A.2d 1153, 1158 (2000); *E.M.*, 735 A.2d at 661 (*citing Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)); *Dickerson*, 508 U.S. at 373, 113 S.Ct. 2130; *Marconi*, 597 A.2d at 620–621. *Kondash* allows safety-related questioning in anticipation of a *Terry* pat down.[11] Neither allows a police officer to require a detainee to expose the contents of his or her pockets. *See E.M.*, 735 A.2d at 661, *citing Adams*, 407 U.S. at 146, 92 S.Ct. 1921 (officer was not entitled under *Terry* to search suspect's pocket for non-threatening contraband). Such a command effected an unreasonable search in excess of that allowed by *Terry*, and, in my view, requires suppression of the evidence thus obtained.

¶ 9 It may be that had Chief Hovanec actually conducted a pat down of Reppert's pants for a weapon as he was permitted to do under *Terry* and its progeny, the "plain

---

9. This was part of the evidence adduced at the hearing by the defendant. It is considered here because it was not contradicted. *See* note 6, *supra*.

10. He was also concerned for Reppert's safety. *Id.* at 6. This should seem odd to no one. When it is discovered that a suspect has a weapon, not only is the officer at risk but so, too, is the suspect. If a gunfight or other altercation ensued, the suspect could easily be injured.

11. The learned trial court, the Honorable Robert C. Reed, President Judge of the Court of Common Pleas of Beaver County, like our colleague, the Honorable Correale Stevens, who authored the unanimous opinion in *Kondash*, astutely recognized "that many drug peddlers carry sharp and dangerous objects, such as needles and razor blades, on their person. It is prudent for officers such as Chief Hovanec in this case, to take added precautions when searching suspected drug dealers so as to avoid injury." Memorandum Opinion, 4/20/01, at 7.

feel" corollary to the plain view exception to the warrant requirement might have resulted in a legitimate seizure of the contents of Reppert's pockets. *See Zhahir,* 751 A.2d at 1163. This was the suppression court's conclusion. Memorandum Opinion, 4/20/01, at 5–6.

¶ 10 A "plain feel" seizure is valid where the officer is lawfully entitled to conduct a pat down for weapons and where it is immediately apparent to the officer conducting the pat down that the item he or she feels is contraband. *Zhahir,* 751 A.2d at 1163. This inquiry "takes into account the totality of the circumstances surrounding the frisk, including, *inter alia,* the nature of the object, its location, the conduct of the suspect, the officer's experience, and the reason for the stop." *Id.* "[A]n officer's subjective belief that an item is contraband is not sufficient unless it is objectively reasonable in light of the facts and circumstances that attended the frisk." *Id.*

¶ 11 In *Zhahir,* while the officer was conducting the limited pat down for weapons under *Terry,* it was immediately apparent, based on his experience, that the large number of vials in the defendant's pocket was contraband. Given their number, "their presence was not equally consistent with legitimate purposes." *Id.* The court in *Zhahir* distinguished its earlier decision in *Commonwealth v. Stevenson,* 560 Pa. 345, 744 A.2d 1261, 1267 (2000), where it had concluded that it was not immediately apparent that a "pill bottle" detected during a frisk was contraband. *Zhahir,* 751 A.2d at 1163. Finally, the *Zhahir* court explained that the officer did not exceed the bounds of a lawful

*Terry* frisk: he did not conduct an additional search to determine that the vials were contraband. *Id.* In so explaining, the court contrasted the facts before it from those in *Dickerson,* 508 U.S. at 378–79, 113 S.Ct. 2130, where the Court concluded that by "squeezing, sliding and otherwise manipulating the contents of the defendant's pocket" the officer exceeded the bounds of a *Terry* pat down and constituted an additional, improper search. *Zhahir,* 751 A.2d at 1163. *See also Commonwealth v. Stoner,* 710 A.2d 55 (Pa.Super.1998)(plain feel requirements satisfied under facts); *compare Marconi,* 597 A.2d at 621 (requirements not satisfied under facts); *Commonwealth v. Fink,* 700 A.2d 447 (Pa.Super.1997) (same); *Commonwealth v. Stackfield,* 438 Pa.Super. 88, 651 A.2d 558 (1994); *Commonwealth v. E.M.,* 558 Pa. 16, 735 A.2d 654 (1999)(same).

¶ 12 Given the fact-intensive determination which "plain feel" cases require, I find no support in the record for the suppression court's conclusion. *See Commonwealth v. McClease,* 750 A.2d 320, 324 (Pa.Super.2000) ("Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based on the facts."); *Commonwealth v. Wood,* 2002 PA Super 304 (2002), *citing Commonwealth v. Jackson,* 451 Pa.Super. 129, 678 A.2d 798, 800 (1996)("[w]hen reviewing an order denying a motion to suppress evidence, we must determine whether the factual findings are supported by the evidence of record").[12] Here, there was no testimony or other evidence upon which to reach this speculative conclusion.[13]

---

12. It cannot be said that a search of the contents of Reppert's pockets, on these facts, was inevitable. *Commonwealth v. Germann,* 423 Pa.Super. 393, 621 A.2d 589, 594 (1993)(proper search not inevitable; evidence should have been suppressed).

13. I recognize that the chief described Reppert's pockets as having large bulges, N.T.,

¶ 13 While, under the circumstances, I do not find Chief Hovanec's actions unreasonable in this day of hepatitis and HIV, *see Kondash*, 2002 PA.Super. 309, 808 A.2d 943, I am constrained to say they were constitutionally impermissible. Accordingly, I concur in the result reached by the majority in ordering the evidence suppressed.

8/31/00, at 6, and that he described their contents upon being emptied. *Id.* at 6, 26. I likewise recognize that Reppert described the contents when he testified and that the contents were observed by the suppression court.

*Id.* at 47–49. There is no record evidence, however, that describes what the contents would have felt like during a proper pat down.